950 F.2d 1165
 UNITED STATES of America, Plaintiff-Appellee,
v.
50.822 ACRES OF LAND, MORE OR LESS, IN NUECES COUNTY, STATE
OF TEXAS, and Joseph A. Hansler, Micheline
Hansler, Urban Eugene Smith, Sue B.
Smith, City of Corpus Christi,
Defendants,
Joseph A. Hansler and Micheline Hansler, Defendants-Appellants.
 No. 90-2588.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 21, 1992.
Rehearing Denied Feb. 24, 1992.
 
 Fisher Alsup, Alsup & Alsup, Corpus Christi, Tex., for Joseph A. Hansler & Micheline Hansler.
 Albert M. Ferlo, Jr., Appellate Sec. Env. & Nat. Res. Div., Washington, D.C., Robert Darden, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Paula Offenhauser, Asst. U.S. Atty., Houston, Tex., for U.S.
 Appeal from the United States District Court for the Southern District of Texas.
 Before BROWN, KING, and GARWOOD, Circuit Judges.
 GARWOOD, Circuit Judge:
 
 
 1
 Defendant-appellants Joseph and Micheline Hansler (the Hanslers) appeal from a judgment in a condemnation proceeding brought by the United States Navy, pursuant to 42 U.S.C. § 4651 et seq., in which the district court awarded the Hanslers nominal compensation in the amount of $100.00 each. We affirm.
 
 Facts and Proceedings Below
 
 2
 In 1984, the City of Corpus Christi, Texas (the City), sought to acquire several parcels of privately-owned land located just past the end of runways at Waldron Field, a naval airfield that has been used since World War II for training pilots. The assumed purpose of this acquisition was to help the Navy prevent impending commercial and residential development from compromising the safety of the runways at the air station.[1] Accordingly, the subject parcels were to be designated as a "clear zone."
 
 
 3
 The Hanslers owned a large parcel in the desired clear zone area. A City representative approached the Hanslers concerning potential condemnation of their property, offering $15,559 per acre for 28.08 of the 39.384 acres they owned. The Hanslers, believing that the Navy would vacate the airstrip within a few years, responded by offering to sell the land to the City for a reduced price of $240,000 (about $8,546 per acre) plus an option to repurchase the property for the sale price plus 8% interest when and if the Navy decided to close the airstrip.
 
 
 4
 The City accepted the Hanslers' offer. The final agreement between the City and the Hanslers contained the following provision:
 
 
 5
 "It is agreed that in the event Waldron Field is closed and the subject clear zone is no longer needed, then the Grantors will have the option to repurchase said property at any time within five years of such event for the cash consideration of Two Hundred Forty Thousand Dollars ($240,000.00) plus eight (8) percent per year simple interest compounded annually from January 9, 1984."
 
 
 6
 Identical language was also incorporated into the warranty deed. After obtaining title to the land, the City transferred the property to the United States Navy for incorporation into Waldron Field.[2] Since that point, the Navy has had control over, possession of, and continuous use of the subject property. Although the arrangement between the City and the Navy with respect to the acquisition of the clear zone parcels has not been disclosed, the government concedes that it was aware of the option to repurchase the land when it took title from the City. Of course, because the option was recorded in the deed and thus a matter of public record, this concession amounts to nothing in the way of an admission of agency.
 
 
 7
 On March 25, 1987, the government filed a complaint in condemnation to acquire the option that the Hanslers received from the City. The government also filed an ex parte motion for immediate possession of the property; this motion was denied because the government failed to establish an urgent need for immediate possession. Initially representing themselves pro se, the Hanslers moved to dismiss the complaint for lack of necessity; this motion was also denied.
 
 
 8
 The suit proceeded to a bench trial on August 30, 1989, the sole issue being valuation. The government offered only one witness--Bruce Calloway, a licensed real estate appraiser. Given the eight percent annual increase in the option price, Calloway concluded that land values would have to increase by at least that rate annually for the option to retain any value. However, stated Calloway, the Hanslers' property was located in a low-priced area that was unlikely to be developed in the future; moreover, real estate in that area had actually lost value in recent years. Therefore, Calloway opined that exercising the option would result in paying more for the land than it was worth unless the airstrip closed immediately. Because by all indications the Navy was going to continue to operate Waldron Field over the foreseeable future, a nominal figure of $100 was suggested as an appropriate condemnation award.
 
 
 9
 The Hanslers, proceeding with the aid of an attorney, offered three witnesses. The first witness was Joseph Hansler himself. Hansler explained that he never intended to part permanently with the land, and that at the time of the sale to the City he estimated the Navy would continue to operate Waldron Field for only five years or less. Moreover, he conceded that the option had value only to him, stating:
 
 
 10
 "The only value of this option that I know of is to me, and I am willing today to exercise my option and give them the $350,000 [$240,000 plus interest] back for their property.
 
 
 11
 "It's worth a lot to me. I feel like I paid $7,000 [per acre] for an option going in."
 
 
 12
 Hansler further stated that, in his opinion, the value of the option was "in excess of $200,000," which he calculated on the basis that it represented the amount by which he had discounted his selling price in consideration of the option, plus interest.
 
 
 13
 The Hanslers then presented Henry Tucker, a long-time local homebuilder and developer. Tucker stated that he owned a similar option in the area, for which he paid "$25,000 or $30,000" several years earlier. When questioned about the Hanslers' option, Tucker asserted that he would pay $2,000 per acre for the option, conceding that "obviously if the Navy doesn't move within about ten years my option would be [worth] nothing. I would be spending approximately $60,000 for a gamble.... [A]s long as it is in the clear or flight zone it is not worth anything."
 
 
 14
 The Hanslers' final witness was Greg Lowsey, a real estate appraiser. When questioned about the value of the Hanslers' option, Lowsey stated:
 
 
 15
 "My opinion would be that as long as the option is being condemned the option really would have no value because if someone bought it, it would still be condemned and it would still have no value.
 
 
 16
 "If the option were to be exercised, I would say that it would be relatively impossible to put a value on it because you don't know what is going to happen in the future."
 
 
 17
 When pressed by the court to arrive at some valuation, Lowsey testified that the option could not be valued as a forced sale because exercise of the option was contingent on an uncertain event, which precluded valuation based on anything other than speculation. Declining to speculate, Lowsey was unable to place a value on the option, prompting the court to blurt in exasperation, "Then why did you come?"
 
 
 18
 Following the one-day trial, the court requested post-trial briefs and findings of fact and conclusions of law from the parties. On June 15, 1990, the court issued its opinion, awarding the Hanslers $100 each as nominal compensation. Recognizing that "speculation and conjecture" have no place in "judicial ascertainments of truth," the court held:
 
 
 19
 "In this case, there is no evidence when or if Waldron Field is to be closed and the subject clear zone would be no longer needed. This matter was simply not developed at trial. The needs of the military are likely difficult to ascertain. World events likely do not lend themselves to sufficient analysis that the Secretary of Defense or Congress can forecast what will be needed. The Navy has been training pilots at the Naval Air Station Corpus Christi since the early 1940s, and Waldron Field has been a part of that effort."
 
 However, the court went on to note that a
 
 20
 "matter troublesome to the Court but not developed by the parties is the effect of the interruption of the option by the governmental agency which ultimately received the benefit of the lower price occurring when the condemnee agreed to give less than full fee in return for less price."
 
 
 21
 Concluding that the record provided an insufficient factual basis on which to fashion equitable relief, the court simply awarded the nominal compensation. This appeal followed.
 
 
 22
 On appeal, the Hanslers urge that the district court incorrectly valued their option as a reversion. Because of the unique nature of their interest, the Hanslers assert that the court should have considered not just the market value of the option, which they concede is little or nothing, but rather the value of the option to them. Additionally, seizing on the district court's fairness point, the Hanslers now argue that an award of nominal damages in this case violates public policy, as the government would be unjustly enriched by selling the option for nearly $200,000 and then condemning it for merely $200. Although we recognize the harsh injustice of this situation, we must affirm.
 
 Discussion
 I. Standard of Review
 
 23
 Although the district court's underlying factual findings must be reviewed under the "clearly erroneous" test, its legal analysis is subject to plenary review. See Breaux and Daigle, Inc. v. United States, 900 F.2d 49, 51 (5th Cir.1990). On appeal from a condemnation proceeding, the reviewing court merely determines whether the compensation awarded was within the range of evidence. United States v. 6,162.78 Acres of Land in Concordia Parish, Louisiana, 680 F.2d 396, 398 (5th Cir.1982).
 
 II. Valuation of the Option
 
 24
 At trial, the burden of establishing value rests with the owner of the condemned property. United States ex rel. T.V.A. v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 1052, 87 L.Ed. 1390 (1943). Value is usually established by presenting the "market value" of the property at the time of taking, which is generally defined as "what a willing buyer would pay in cash to a willing seller." United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943). Thus, typically an owner is compensated for value that is transferable from owner to owner. Kimball Laundry Co. v. United States, 338 U.S. 1, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765 (1949). Where property has no market value, the district court may consider other data to ascertain value, Miller, 63 S.Ct. at 280; however, the district court may consider only reasonably probable events that affect value. United States v. 158.24 Acres of Land in Bee County, Texas, 515 F.2d 230, 232 (5th Cir.1975).
 
 
 25
 The Hanslers concede that their option has no market value; nevertheless, they argue that nominal compensation is not "just compensation" within the meaning of the Fifth Amendment. The Hanslers assert that the "actual or intrinsic value" of the option may be calculated in either of two ways. First, the Hanslers assert that the difference between the fair market value of the land and the cost to exercise the option as of the date of trial was $128,497.02.[3] This figure, contend the Hanslers, is evidence of the value of the option. Second, the Hanslers argue that the intrinsic value of the option is represented by the amount that the Hanslers reduced the sale price below the offer price in consideration of the option ($196,876.72).
 
 
 26
 Aside from Joseph Hansler's own testimony, none of the evidence presented at trial supports the figures now presented by the Hanslers. The government's expert witness and one of the Hanslers' witnesses testified that the option had no value. The government's expert also testified, based simply on mathematical principles, that (at least once the option price equaled the value of the land) the value of the land would have to increase by at least eight percent per year to make exercising the option economically sound. However, far from matching the appreciation of the option, land values had actually declined between 1984 and 1989 in the wake of the real estate "bust." Another witness, the real estate developer, testified that he would be willing to purchase the option for two thousand dollars per acre, conceding that he would be taking a "gamble" because the option would be worthless to him unless the Navy abandoned Waldron Field within ten years. No evidence was presented at trial to suggest that the Navy would be gone within that period, or within any period for that matter.
 
 
 27
 Mr. Hansler himself acknowledged that the option had value to him only. The only value he was able to place on the option was the reduction in the City's purchase price below its original offer; i.e., the amount the Hanslers "paid" for the option. However, "the Fifth Amendment allows the owner only the fair market value of his property; it does not guarantee an owner a return of his investment." Powelson, 63 S.Ct. at 1057.
 
 
 28
 The Hanslers next highlight the district court's inaccurate characterization of the interest being condemned as an "option to purchase a reversion" or a "mere possibility of reverter" in an attempt to show that court arrived at nominal compensation because it valued the wrong interest.[4] As the Hanslers correctly point out, the disputed interest is an option to purchase the entire fee. However, the Hansler's unusual option is not so different from a reversion as they might suggest--the condition precedent to the option operates similarly to a condition precedent to a reversion. Further, although the court did not state that it was reasoning by analogy, the speculative nature of the condition to the option was the focus of its reasoning, not the characterization of the interest as an option or reversion. The award of nominal compensation was based on the court's determination that the remote and speculative possibility of whether and when the airstrip would be closed rendered the option worthless. This determination was amply supported by the testimony offered at trial, even that from the Hanslers' own witnesses.
 
 
 29
 Given the record before us, it appears that the Hanslers have failed to meet their burden of establishing the value of the option. Accordingly, the district court's award of only nominal compensation was not clearly erroneous.
 
 III. Public Policy
 
 30
 The Hanslers next advance an equitable argument that was initially raised sua sponte by the district court after trial and which focuses on the unique position of the Navy as grantee; i.e., on the Navy's power to avoid the option through the powerful means of condemnation. In this regard, the Hanslers now argue that the Navy's failure to compensate them for what they gave up when they sold the property violates public policy. Moreover, contend the Hanslers, allowing the Navy to condemn an option "worth" nearly $200,000 for only $200 unjustly enriches the Navy. Because no federal precedent addresses this argument, the Hanslers reason by analogy to a 1987 Texas Supreme Court opinion, which held that a governmental entity-condemnor, grantee in a previous gift deed in which the grantor-condemnee retained a reversionary interest, must pay the full value of the unrestricted fee less the value of the restricted fee in condemning the reversionary interest. Leeco Gas & Oil Co. v. Nueces County, 736 S.W.2d 629, 631-32 (Tex.1987). Applying that formula to their situation, the Hanslers arrive at $196,876.72, or the amount by which the fair market value of the property ($436,876.72)[5] exceeded the reduced sale price with the option ($240,000).
 
 
 31
 The Leeco facts involved a condemnation action brought by Nueces County, Texas, to condemn a reversion retained in an earlier gift deed of park land from the condemnee to the County. Upon the failure of the County to continue to operate a park on the granted land, the land was to revert back to the grantor. In Leeco, the Texas Supreme Court first observed that a mere possibility of reverter generally has no ascertainable value when the event upon which the possessory estate in fee ends is not probable within a reasonably short period of time. Leeco, 736 S.W.2d at 631 (citing Restatement of Property § 53, comment b (1936)). However, the court distinguished a "remote" possibility of reverter by concluding that in the case before it the County was not condemning a remote possibility of reverter but rather was attempting to remove the "burden" of the retained reversionary interest. The court concluded that
 
 
 32
 "[t]o allow a governmental entity, as grantee in a gift deed, to condemn the grantor's reversionary interest by paying only nominal damages would have a negative impact on gifts of real property to charities and governmental entities. It would discourage these types of gifts in the future. This is not in the best interests of the citizens of this State." Id. at 631.
 
 
 33
 The court then held that the County, in compensation for condemning the reversionary interest, had to pay the condemnee the amount by which the value of the unrestricted fee exceeded the value of the restricted fee. Id. at 631-32 (citing Ink v. City of Canton, 4 Ohio St.2d 51, 212 N.E.2d 574, 579 (Ohio 1965)).
 
 
 34
 In this case of first impression, we decline to either adopt or reject the reasoning in Leeco. The appellants Hanslers--on whom the burden rested to establish the amount they were entitled to recover--failed to raise this point below, and the record is factually insufficient for appellate application of a Leeco -like holding in their favor. In particular, we note that the relationship between the City and the Navy with respect to the acquisition of the tracts in the clear zone remains a mystery, the only known fact being that the Navy has not denied being "aware" of the option in the deed. Further, no evidence was presented at trial regarding the price paid by the Navy for the Hanslers' property. Thus, while the equities in Leeco were clear, in the present case they are much less so. Moreover, the Navy has not been afforded an opportunity to present evidence that might be relevant in applying the Leeco rule (or some variant thereof) or in showing some equity in its favor. The Leeco court found it significant, for example, that the same governmental entity that was grantee in the condemnee's gift deed subsequently sought to condemn the reversionary interest that the condemnee had retained. In the present case, the City, acting in an undisclosed capacity,[6] posed an intermediate step between the Hanslers and the Navy. Moreover, aside from the January 1984 City offer price of $15,559 per acre and the government expert's testimony that land prices declined between 1984 and 1989, the district court was presented with no evidence on the fair market value of the subject tract (either free of the option or burdened by it) as of the time of taking or the time of trial or at any other time.
 
 
 35
 Faced with this paucity of evidence, we are unable to determine whether the circumstances of this case warrant application of equitable relief. We thus apply the usual rule that we do not consider an issue not properly raised below where (inter alia ) the issue is not a purely legal one and had it been raised below additional factual development in the trial court would have been appropriate. See, e.g., Volkswagen of America, Inc. v. Robertson, 713 F.2d 1151, 1166 (5th Cir.1983). Accordingly, while we recognize the possibility for injustice in this situation, we must affirm.[7]
 
 Conclusion
 
 36
 For the reasons stated, the judgment of the district court is
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 The City was not made a party to this action and no evidence regarding the City's motives was offered to, or otherwise before, the district court below. However, the Navy concedes that the City sought to acquire the subject parcels for the ultimate purpose of benefiting the Navy
 
 
 [2]
 The record contains no indication of when the City transferred the land to the Navy. Also absent from the record is any mention of the price, if any, the Navy paid the City for the land. The only evidence of the transfer is a certificate of title insurance, which reflects an effective date of March 19, 1986 and an insured amount of $597,723. The title policy covers not only the tracts conveyed by the Hanslers (28.083 acres), but also covers nearby tracts conveyed by Urban and Sue Smith (22.739 acres), who declined to challenge the proceeding below
 
 
 [3]
 According to the Hanslers, this figure represents the difference between market value ($436,876.72--the City's original offer price) and the cost to repurchase the land under the option on the date of taking ($308,379.70). The latter figure was computed by compounding $240,000 annually from January 9, 1984 until March 25, 1987 at 8% simple interest. With regard to this calculation, we note that no evidence was ever submitted regarding market value of the tract itself either at the time of taking or the time of trial. The only evidence of market value (assuming it to be such) at any time was the price originally offered by the City in 1984, when land values in Texas began to peak
 
 
 [4]
 A reversionary interest is " 'any future interest left in a transferor or his successor in interest.' " Eastex Aviation, Inc. v. Sperry & Hutchinson, 522 F.2d 1299, 1306 (5th Cir.1975) (quoting Restatement of Property § 154). A possibility of reverter is a reversionary interest subject to a condition subsequent. Id. n. 12. An option, in contrast, is a continuing offer to sell that is supported by consideration and is irrevocable during the period specified. Reynolds v. Maples, 214 F.2d 395, 398 (5th Cir.1954). The Hanslers did not retain any interest in the property; rather, they acquired an option subject to a condition precedent, namely the closing of Waldron Field
 
 
 [5]
 This figure, continually relied upon by the Hanslers, actually represents only the City's original offer price of about $15,559 per acre for 28.08 acres. No testimony on the fair market value of the tract itself (as of any time) was offered at trial
 
 
 [6]
 The district court found that the Navy had expressed concern about neighborhood encroachment of its air fields, and the City, "being sympathetic, either on its own or with the financial participation of the Navy, purchased the property under threat of condemnation. Ultimately, the City transferred the property to the Navy ..." (emphasis added). However, later in its opinion, the district court noted that the Navy "ultimately received the benefit of the lower price occurring when the [Hanslers] agreed to give less than full fee in return for less price." Thus, although the most likely inference is that the City acted at the behest of the Navy, the district court did not so find explicitly. Moreover, the record discloses that the Navy's survey of the area as part of its land acquisition project (land "to be acquired") was dated seven months after the conveyance by the Hanslers to the City
 
 
 [7]
 We finally note that if the Hanslers could establish that the Navy was an original grantee, it may be that the Navy's use of the trump card of condemnation to wriggle out of the option could be cast as a breach of the original agreement. However, the court of claims, not the district court, would have jurisdiction over such a claim. 28 U.S.C. § 1346(a)(2). Our affirmance is not intended to preclude (or to approve) such a proceeding by the Hanslers