William S. RICHARDSON; Henry H. Peters, Jr.; Oswald K. Stender, Myron B. Thompson, and Matsuo Takabuki, in their capacities as Trustees of the Kamehameha Schools/Bernice Pauahi Bishop Estate, Plaintiffs–Appellants,

v.

CITY AND COUNTY OF HONOLULU, a Hawaii Municipal Corporation, Defendant–Appellee,

and

Hale Coalition, Intervenor.

William S. RICHARDSON; Henry H. Peters, Jr.; Oswald K. Stender, Myron B. Thompson, and Matsuo Takabuki, in their capacities as Trustees of the Kamehameha Schools/Bernice Pauahi Bishop Estate, Plaintiffs–Appellees,

and

Hale Coalition, Intervenor,

v.

CITY AND COUNTY OF HONOLULU, a Hawaii Municipal Corporation, Defendant–Appellant.

William S. RICHARDSON; Henry H. Peters, Jr.; Oswald K. Stender, Myron B. Thompson, and Matsuo Takabuki, in their capacities as Trustees of the Kamehameha Schools/Bernice Pauahi Bishop Estate, Plaintiffs–Appellees,

v.

HAWAII LEASEHOLDERS EQUITY COALITION, Intervenor–Appellant,

and

City and County of Honolulu, a Hawaii Municipal Corporation, Defendant.

SMALL LANDOWNERS OF OAHU, Plaintiff–Appellant,

v.

CITY AND COUNTY of HONOLULU, Defendant–Appellee.

Nos. 94–16041, 94–16142, 94–16143 and 94–16327.

---

United States Court of Appeals,
Ninth Circuit

Argued and Submitted Nov. 2, 1995.

Decided Sept. 8, 1997.

C. Michael Hare, Cades Schutte Fleming & Wright, Honolulu, Hawaii; James K. Mee, Ashford & Wriston, Honolulu, Hawaii for plaintiffs-appellants.

Thomas P. Rack, Deputy City Counsel, City and County of Honolulu, Honolulu, Hawaii; Lex R. Smith, Kobayashi, Sugita & Goda, Honolulu, Hawaii for defendant-appellee.

Dennis E.W. O'Connor and Jerrold K. Guben, Reinwald, O'Connor, Marrack, Hoskins & Playdon, Honolulu, Hawaii for intervenor-appellee-cross-appellant.

H.K. Bruss Keppeler, Honolulu, Hawaii for amicus curiae.

Before: HUG, Chief Judge, THOMPSON and O'SCANNLAIN, Circuit Judges.

HUG, Chief Judge:

## OPINION

In these consolidated cases we are asked to determine the constitutionality of two land reform ordinances passed by the City Council for the City and County of Honolulu (the "City"). Ordinance 91–95 provides a mechanism for converting leasehold interests in condominium units to fee interests, through the use of the City's condemnation power. Ordinance 91–96 is a rent control measure that limits increases in ground rent due the owner of the land under the condominium units. The trustees of the Bishop Estate ("Bishop Estate") brought an action before District Judge Ezra contesting the constitutionality of both ordinances. The Small Landowners of Oahu ("Small Landowners") brought a separate action before District Judge Fong. Judges Ezra and Fong each entered summary judgments upholding Ordinance 91–95. Judge Ezra also entered a summary judgment holding Ordinance 91–96 (the rent control ordinance) unconstitutional. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## I. BACKGROUND

Prior to American acquisition, Hawaii developed an extensive feudal land ownership system that has proved remarkably resistant to change. Although Hawaiian leaders and

American settlers have repeatedly attempted to divide the large Hawaiian land estates, the results have generally been unsuccessful. As of the late 1980's, the largest eighteen landowners in the state owned 40% of the available land. L.A. Powe, Jr., *Economic Make–Believe in the Supreme Court*, 3 Const. Comm. 385, 389 (1986). The seventy-two largest landowners owned 47%. *Id.* With the federal and state government owning 49% of the land in the state, *id.*, little is left for the rest of the population. As might be expected in an area of desirable real estate with little land for sale, the price of owning land in Hawaii has grown exponentially over the past several decades.

The large private landowners have adopted a pattern of leasing their land for long terms rather than selling it. Often the land is leased to a developer who builds condominiums[1] on the property. The condominiums are then sold subject to the ground lease. Sometimes the landowners themselves build and sell the condominiums, subject to a ground lease. The leases, commonly for 55 years or longer, require a substantial initial payment and lease payments for 25 to 30 years at a fixed rate. At the end of the initial term, the rent is renegotiated pursuant to the terms of the lease. The new rent usually is based on the market value of the unimproved land as described in the lease. Stated another way, the renegotiated rent is fixed at a percentage of the market value of the parcel underneath the condominium exclusive of improvements (*i.e.*, the condominium).[2] In almost all cases, the renegotiated rent substantially exceeds the initial fixed rate.

To break up this pattern of land ownership and control the escalating prices of housing, the City passed Ordinances 91–95 and 91–96 on December 18, 1991.

That day the appellants in *Richardson* filed suit in federal court before Judge Ezra seeking declaratory and injunctive relief. The *Richardson* appellants are trustees of the Bishop Estate, a charitable trust established in 1884 under the will of Ke Ali'i Bernice Pauahi Bishop, the great-granddaughter of King Kamehameha I, to erect and maintain schools for indigents and orphans who are native Hawaiians. The Bishop Estate owns the fee simple title to the land underneath condominiums in Honolulu that are affected by the Ordinances.[3] A group of condominium owners calling themselves the Hawaii Leaseholders Equity Coalition (the "HALE coalition") was granted permission to intervene in the action as an interested party.

On February 14, 1992, the Bishop Estate filed a partial motion for summary judgment. On June 8, 1992, the HALE Coalition also moved for partial summary judgment. On June 9, 1992, the City filed a cross-motion for summary judgment on all counts.

Meanwhile, on June 12, 1992, the Small Landowners, a nonprofit membership corporation representing landowners who own smaller plots of land underneath condominium projects, filed a separate complaint in federal court before Judge Fong seeking a declaration that Ordinances 91–95 and 91–96 were constitutionally invalid. The Small Landowners moved to consolidate their ac-

1. For purposes of this opinion, unless otherwise noted, references to "condominiums" or "condominium properties" include condominium property regime developments, cooperative housing corporation developments, and planned unit developments, which are the three types of developments addressed by Ordinances 91–95 and 91–96.

2. An example provided by the landowners in their brief is illustrative. The lessees of one apartment purchased their unit in January of 1988 for $986,500, and assumed the existing ground lease. They currently pay $45 per month in ground lease rent and will continue to do so until the 30–year fixed rent period expires in 1997. At that time, the lease fixes the new rent

at six percent of the fair market value of the land exclusive of improvements. If the period had ended in 1991, the parties to the lease might have used the real property tax assessed value used by the City as the fair market value of the land exclusive of improvements. In 1991 the real property tax assessed value used by the City for the land appurtenant to the unit was $213,300. The new ground lease rent would be 6% of that figure, which is $12,798 per year, or $1,066 per month.

3. The City contends that the Bishop Estate owns approximately 20% of the condominiums on Oahu. The Bishop Estate does not refute this number.

tion with (or alternatively, to intervene in) the action instituted by the Bishop Estate. The motion was denied and the Small Landowners' suit proceeded separately.

On September 16, 1992, Judge Ezra (1) declared Ordinance 91–96 unconstitutional on its face under the Takings Clause; (2) held that Ordinance 91–95 was facially constitutional under the Public Use, Just Compensation, Due Process, and Equal Protection Clauses of the federal and Hawaii constitutions; and (3) certified to the Hawaii Supreme Court the question whether Ordinance 91–95 was preempted by state law. *See Richardson v. City & County of Honolulu,* 802 F.Supp. 326 (D.Haw.1992).

The Small Landowners and the City subsequently stipulated to dismiss the Small Landowners' claim regarding Ordinance 91–96. The parties also agreed to dismiss the Small Landowners' claims regarding state law preemption, because those questions would be decided by the Hawaii Supreme court in the *Richardson* case. On September 16, 1993, Judge Fong issued his order holding that Ordinance 91–95 was facially constitutional under the Takings, Due Process, and Equal Protection Clauses of the federal and Hawaii constitutions, and that the Small Landowners' claims that Ordinance 91–95 failed to provide just compensation or comply with the City's Charter were unripe. *See Small Landowners of Oahu v. City & County of Honolulu,* 832 F.Supp. 1404 (D.Haw.1993).

On February 22, 1994, the Hawaii Supreme Court answered the certified question from *Richardson* in the negative, *Richardson v. City & County of Honolulu,* 76 Hawai'i 46, 868 P.2d 1193 (1994), and on April 12, 1994, Judge Ezra adopted the Hawaii Supreme Court's answer. On April 18, 1994, Judge Ezra entered final judgment. Judge Fong entered final judgment in *Small Landowners* on June 20, 1994. All parties filed timely notices of appeal. Because of the similar issues presented, the two actions were consolidated before this court after oral argument.

## II. ORDINANCE 91–95

### A. *The Statue*

Ordinance 91–95, which closely parallels Hawaii's Land Reform Act of 1967, creates a mechanism through which condominium owners can convert their leasehold interests into fee simple interests. When at least 25 owners in a condominium complex or the owners of 50% of the units, whichever is less, apply to purchase their leased fee interest, the Ordinance's condemnation procedure is triggered. The Department of Housing and Community Development (the "Department") then determines if the property is proper for condemnation. The Department will begin condemnation proceedings within twelve months unless the owner agrees to voluntarily sell the leased fee interest to the lessees. If the Department condemns the land, the lessee must purchase the land from the City within 60 days.

In conjunction with enacting the Ordinance, the City made several findings regarding the concentration of land in Honolulu and the effects on such concentration on the local economy. First, the City found that landowners have refused to sell proportionate shares in their fee simple titles and that the few sales that occurred involved exorbitant prices. Honolulu City & County, Haw. Ordinance 91–95, § 1(a). This refusal to sell fee simple titles, along with other factors, has caused a dramatic increase in the price of housing in Honolulu. *Id.* The City further found that persons wishing to reside on Oahu were forced to sign long-term leases that provide for periodic rent renegotiation. *Id.* These conditions have led to

> the acute recent inflation of land costs [that] has adversely affected lease rent negotiations of persons who have purchased leasehold multi-family units as their homes: in some instances renegotiations have resulted in lease rents that have increased over 1,000 percent. Under the burden of increased lease rents, many owner-occupants of residential condominium apartments ..., especially those on fixed incomes, have found, and will continue to find themselves unable to afford to continue living in their homes.

*Id.* Moreover, the City determined that these defects in the housing market would adversely affect the City's economy:

There is a close relationship between the monetary values accorded land on Oahu and the stability and strength of Oahu's economy as a whole. Residential condominium ... land values, artificially inflated by concentrated or single ownership, market conditions or other factors, skew Oahu's economy toward unnecessarily high levels. The pervasive and substantial contribution made to inflation by high residential condominium ... land values creates a potential for economic instability and disruption on Oahu. Economic inflation, instability and disruptions on Oahu have real and potential damaging consequences for all members of an affected society.

*Id.* The City thus decided to exercise its power of eminent domain to establish a proper real estate market in Honolulu and to reduce the potential for economic instability on Oahu.

### B. *The Public Use Clause*

The Bishop Estate and the Small Landowners (collectively the "landowners") argue that Ordinance 91–95 violates the Public Use Clause of the United States and Hawaii constitutions. The Fifth Amendment of the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. This provision applies to the states through the Fourteenth Amendment. *See Missouri Pac. Ry. v. Nebraska,* 164 U.S. 403, 417, 17 S.Ct. 130, 135, 41 L.Ed. 489 (1896). Municipalities possessing delegated eminent domain power also are subject to the restrictions of the Fifth and Fourteenth Amendments. *See Chicago B. & Q. R.R. Co. v. City of Chicago,* 166 U.S. 226, 238–39, 17 S.Ct. 581, 585–86, 41 L.Ed. 979 (1896). Similarly, the Hawaii Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." Haw. Const. art I., § 20.

The landowners argue that Ordinance 91–95 is unconstitutional because it takes land for the benefit of private persons and, alternatively, that its public purpose is not served by its mechanism. As noted above, the Ordinance is similar to Hawaii's Land Reform Act of 1967[4] (the "Act"), which was upheld on public use grounds in *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). Because of the Ordinance's similarity to the Act, we begin our analysis with *Midkiff.*

In that case, the Supreme Court upheld the Act, concluding that Hawaii could constitutionally use its power of eminent domain to break up a land oligopoly. *Id.* at 241–42, 104 S.Ct. at 2329–30. The Supreme Court rejected the landowners' arguments that the Act violated the public use requirement of the Takings Clause.[5] The Court stated, "The 'public use' requirement thus is coterminous with the scope of a sovereign's police powers." *Id.* at 240, 104 S.Ct. at 2329.

Thus, as the Court noted, the judiciary's role in reviewing the legislature's judgment regarding public use is extremely narrow. *Id.* The judiciary should defer to the legislature's public use determination unless the use involves an "impossibility" or is "palpably without reasonable foundation." *Id.* at 240–241, 104 S.Ct. at 2329–30. The Court further noted that "where the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause." *Id.* at 241, 104 S.Ct. at 2329–30.

Applying that test, the Court noted that the state legislature determined a land oligopoly existed in Hawaii. The Court reasoned that regulating the "oligopoly and the evils associated with it is a classic exercise of a State's police powers." *Id.* at 242, 104 S.Ct. at 2330. Even though the Act's result was to turn land over from one private owner to

---

4. The Act was designed to compel large landowners to break up their estates. Under the Act, tenants who lease and live on single-family residential lots within developmental tracts at least five acres in size can ask the Hawaii Housing authority ("HHA") to condemn the property on which they live. When half of the tenants in the tract, or 215 tenants, whichever is less, file an application, the HHA can acquire some or all of the lots in the Act by condemnation. The HHA then can sell the lots to the tenants.

5. The landowners in *Midkiff* were trustees of the Bishop Estate, the appellants in the *Richardson* action.

another, the Court held that the statute's purpose was sufficiently public. *See id.* at 241, 104 S.Ct. at 2329. Finally, the Court noted that using a lease-to-fee transfer statute to regulate that oligopoly was not irrational. *Id.* Accordingly, the Court upheld the Act.

The analysis under the Hawaii Constitution is similarly deferential to the legislature's public use determination.

> [O]nce the legislature has spoken on the social issue involved, so long as the exercise of the eminent domain power is rationally related to the objective sought, the legislative public use declaration should be upheld unless it is palpably without reasonable foundation. The crucial inquiry is whether the legislature might reasonably consider the use public, and whether it rationally could have believed that application of the sovereign's condemnation powers would accomplish the public use goal.

*Hawaii Housing Authority v. Lyman,* 68 Haw. 55, 704 P.2d 888, 897 (1985) (internal citation omitted).

In the present action, both district courts determined that *Midkiff* controlled the outcome of this dispute. Because the statute in *Midkiff* and Ordinance 91–95 are so similar, both courts found no merit in the Landowners' public use arguments. Before this court, the landowners seek to distinguish *Midkiff* on several grounds: (1) that the standard of review has changed since *Midkiff;* (2) that the public purpose of the Ordinance is not as compelling as the purpose asserted in *Midkiff;* and (3) that the means of effectuating the purpose is irrational in light of developments since *Midkiff.* We discuss each of these arguments.

### 1. *Change in the standard of review*

■ The landowners argue that, in light of *Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) and *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), the deference given in *Midkiff* to the legislative body's public use findings is inappropriate. The landowners assert that those cases require heightened scrutiny. We conclude that those cases are not applicable because they involved uncompensated regulatory takings, in which the issues are quite different.

In a regulatory taking case, the court must determine whether a putative regulatory action masks a taking. For example, in *Dolan,* the most recent case, a shop owner in Oregon brought suit against the City of Tigard. She had applied for a permit needed to expand her store and pave a parking area. *Dolan,* 512 U.S. at 379, 114 S.Ct. at 2313–14. The city's planning commission granted the permit application, but only on the condition that the shop owner dedicate to the city part of her property that was within a floodplain plus a 15 foot strip of land for use as a pedestrian pathway. *Id.* at 379–80, 114 S.Ct. at 2313–14. The shop owner filed suit alleging that the condition was an unconstitutional regulatory taking.

*Dolan,* as well as *Lucas* and *Nollan,* are quite different from the cases before us. At bottom, those cases involve balancing the authority of state and local governments to engage in land use planning against the property rights of individuals. *See Dolan,* 512 U.S. at 383–86, 114 S.Ct. at 2315–17. The primary issue is whether the landowner is to receive just compensation. *See e.g., id.* at 385, 114 S.Ct. at 2317 ("Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the property sought has little or no relationship to the benefit."). That is, if the Court would have upheld the putative regulatory actions in those cases, the landowners' property would have been subject to the challenged land restriction and the owner would not have been entitled to compensation for the diminution in land value. The heightened scrutiny applied in *Dolan* thus is necessary to prevent the government from using its regulatory power to force individuals to bear burdens that properly should be born by the public. *See id.,* at 389, 114 S.Ct. at 2319 ("We think

this standard is too lax to adequately protect petitioner's right to just compensation if her property is taken for a public purpose.").

Conversely, in the cases before us, the government has expressly exercised its condemnation power and will compensate the landowners. Here, as in *Midkiff,* the requirement of just compensation ensures that individuals will not be forced to bear public burdens, which in all fairness should be borne by the public as a whole. Heightened scrutiny thus is inappropriate. The language used throughout *Midkiff* indicates that deference to the legislative body's public use determination is required when the taking is fully compensated. *See e.g., Midkiff,* 467 U.S. at 241, 104 S.Ct. at 2329–30 ("[W]here the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause."). For these reasons, we believe that *Nollan–Lucas–Dolan* trio does not signal a change from this long standing rule of deference because we see nothing inconsistent in applying heightened scrutiny when the taking is uncompensated, and a more deferential standard when the taking is fully compensated.

We hold, therefore, that the standard of review to be used in examining Ordinance 91–95 is the minimum scrutiny test espoused in *Midkiff.* We will defer to the City's determination regarding public use unless the use involves an "impossibility" or is "palpably without reasonable foundation." *Midkiff,* 467 U.S. at 240–41, 104 S.Ct. at 2329.

2. *The rationality of the public purpose*

■ Unlike the statute at issue in *Midkiff,* the Ordinance is not grounded on the desire of breaking up a land oligopoly. Rather, the City enacted the Ordinance to strengthen Oahu's economy and remedy perceived failures in its real estate market. The City found:

> There is a close relationship between the monetary values accorded land on Oahu and the stability and strength of Oahu's economy as a whole. Residential condominium, cooperative housing and planned development land values, artificially inflat-

ed by concentrated or single ownership, market conditions or other factors, skew Oahu's economy toward unnecessarily high levels. The pervasive and substantial contribution made to inflation by high residential condominium, cooperative housing and planned development land values creates a potential for economic instability and disruption on Oahu. Economic inflation, instability and disruptions on Oahu have real and potential damaging consequences for all members of an affected society. Checking inflation, improving the stability of the economy, and avoiding disadvantageous economic disruptions all are productive of general benefit to all members of Oahu's community.

Honolulu City & County, Haw. Ordinance 91–95 § 1(a).

This purpose—remedying a failure in the real estate market and strengthening the economy—is a public purpose. *See Midkiff,* 467 U.S. at 242, 104 S.Ct. at 2330 (land oligopoly caused failure in real estate market; regulating evils associated with oligopoly is classic exercise of police power); *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954) (affirming the constitutionality of the District of Columbia Redevelopment Act of 1945, which provided for the condemnation of slum areas for possible sale to private interests). The landowners contend, however, that the evidence presented to the City does not support the stated public purpose. They assert that, contrary to the City's findings, ownership of condominium units is not concentrated in the hands of large landowners and that landowners do sell proportionated shares of their fee simple titles. Thus, they argue that because the City incorrectly determined these facts, the findings do not support the Ordinance's stated public purpose.

Under the standard espoused in *Midkiff,* we must accept the public purpose of the Ordinance unless the City's findings are "palpably without reasonable foundation." *Midkiff,* 467 U.S. at 241, 104 S.Ct. at 2329. The City held three days of public hearings before enacting the Ordinance. The City determined that the price of condominiums was higher because the ownership of the fee-

simple titles to the land underneath the condominiums was excessively concentrated. While the hearings produced conflicting testimony, one study presented to the City showed that the largest 20 Landowners own 34.9% of the land under condominium units in Honolulu, and that the largest 60 own 50.4%. Legislative Reference Bureau, Report No. 6, *Ownership Patterns of Land Beneath Hawaii's Condominiums and Cooperative Housing Projects* 21 (1987) (*Ownership Patterns*). While the largest 20 landowners own a smaller percentage of land underneath condominiums than the largest 22 owned of the fee simple titles when the Court decided *Midkiff, see Midkiff,* 467 U.S. at 232, 104 S.Ct. at 2325, the concentration of ownership of land underneath condominiums is greater than the concentration of land ownership throughout the state at the time *Midkiff* was decided. *Compare Ownership Patterns* at 21 (60 persons own 50.4% of land under condominiums), *with Midkiff,* 467 U.S. at 232, 104 S.Ct. at 2325 (72 persons own 47% of land in Hawaii). We thus cannot say that the City's finding is without reasonable foundation.

Similarly, the evidence presented to the City regarding the amount of fee simple lands for sale underneath condominiums was conflicting. We are not free to substitute our judgment for that of the City. The evidence reviewed by the City adequately demonstrated that the land underneath the condominiums was not being sold and that the lack of such sales was driving up the price of housing in Honolulu. We therefore must accept the City's asserted public purpose because its findings are not without reasonable foundation. *See Midkiff,* 467 U.S. at 241, 104 S.Ct. at 2329 ("In short, the Court has made clear that it will not substitute its judgment for a legislature's judgment as to what constitutes a public use 'unless the use be palpably without reasonable foundation.' ") (citation omitted).

### 3. *The reasonableness of the means used*

■ The landowners also argue that, between 1987 and 1990, the price of condominiums in Hawaii increased by 66%. However, the price of single-family dwellings—which were subject to the Act's lease-to-fee provision—increased by 98%. Dep't of Business and Economic Dev., *The State of Hawaii Databook 1990: A Statistical Abstract* 549 (1990). Thus, the landowners argue that even if a lease-to-fee statute was reasonably related to eliminating a land oligopoly at the time of *Midkiff,* such means are not rationally related to remedying a failure in the real estate market and strengthening the economy in light of recent history.

Deference to the legislative body's public use determination is required " 'until it is shown to involve an impossibility.' " *Midkiff,* 467 U.S. at 240, 104 S.Ct. at 2329 (quoting *Old Dominion Co. v. United States,* 269 U.S. 55, 66, 46 S.Ct. 39, 40–41, 70 L.Ed. 162 (1925)). "Any departure from this judicial restraint would result in courts deciding on what is and is not a governmental function and in their invalidating legislation on the basis of their view on that question at the moment of decision, a practice which has proved impracticable in other fields." *United States ex rel. T.V.A. v. Welch,* 327 U.S. 546, 552, 66 S.Ct. 715, 718, 90 L.Ed. 843 (1946). Additionally, in *Midkiff* the Court noted that whether the statute actually succeeds is irrelevant.

> But "whether *in fact* the provision will accomplish its objectives is not the question: the [constitutional requirement] is satisfied if ... the ... [state] Legislature *rationally could have believed* that the [Act] would promote its objective." When the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings ... are not to be carried out in the federal courts.

*Midkiff,* 467 U.S. at 242–43, 104 S.Ct. at 2330 (brackets in original) (quoting *Western & Southern Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 671–72, 101 S.Ct. 2070, 2084–85, 68 L.Ed.2d 514 (1981)) (internal citations omitted).

Under the rational basis test, we hold that the Ordinance is constitutional under both the United States and Hawaii constitutions. Regardless of what has occurred with single-family dwellings, the City rationally could have believed that, if the supply of condomin-

iums increased (through the lease-to-fee measure of Ordinance 91–95), the price of those condominiums would decrease. Additionally, although the price of single-family houses increased dramatically between 1987 and 1990, there is no indication that the price would not have gone up even more without the Act's lease-to-fee mechanism. Finally, even if the price of condominiums does not decrease as a result of the Ordinance, some of the public purposes of the Ordinance will be served. If a family is allowed to purchase its condominium, that family will not risk being thrown out of its home in 25 years because the family cannot afford the renegotiated rent. The City rationally could have concluded that the lease-to-fee mechanism would remedy defects in the housing market and stabilize Oahu's economy.

### C. The Just Compensation Clause

■ When a government uses its powers of eminent domain to condemn property, it must provide the property owner with "just compensation." U.S. Const. amend V.; *accord* Haw. Const. art. I, § 20. Just compensation is the "full monetary equivalent of the property taken." *United States v. Reynolds*, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970).

The landowners argue that Ordinance 91–95 does not fully compensate them for the taking of their property. In particular, they argue that the Ordinance fails to provide compensation for their loss of rental income or for the diminution in the value of their remaining fee simple interest in any land that is involuntarily converted from their sole ownership to a cotenancy under the ordinance.[6] Both district courts dismissed these claims as unripe. *Richardson*, 802 F.Supp. at 341; *Small Landowners*, 832 F.Supp. at 1411.

■ Ripeness is a question of law reviewed *de novo*. *Carson Harbor Village Ltd. v. City of Carson*, 37 F.3d 468, 474 (9th Cir.1994). "If a claim is unripe, federal courts lack subject matter jurisdiction and

the complaint must be dismissed." *Southern Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir.1990). Whether a claim is ripe generally turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Devel. Comm'n*, 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983). The "central concern [of the ripeness inquiry] is whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3532 at 112 (2d ed. 1984).

Here, the Bishop Estate came to federal court the same day the City enacted the Ordinance. The condemnation procedure at issue is not self-executing. Rather, several events must occur before any taking will occur. First, at least 25 condominium owners or the owners of 50% of the units, whichever is less, must file an application with the Department to trigger the Ordinance's procedures. Then, after "[d]ue notice is given and a public hearing held," the Department must determine whether the "exercise of the power of eminent domain" requested by the applicants "will effectuate the public purposes of [the Ordinance]." Honolulu City & County, Haw. Ordinance 91–95 § 2.2(a)(2). The Ordinance also requires that, before the Department exercises its power of eminent domain, that the lessor and lessees negotiate "the just compensation which" will be paid. Honolulu City & County, Haw. Ordinance 91–95 § 4.6. Only then will the Department set forth to condemn property.

At this juncture, no group of tenants has asked the Department to invoke the condemnation procedures created by the Ordinance. It is possible that any one of the conditions precedent to the exercise of the Department's eminent domain power might not occur. A sufficient number of qualifying tenants, *see* Honolulu City & County, Haw.

---

**6.** Under the Ordinance, the Department has the option of condemning only a portion of the fee simple title under a condominium project (such as where some of the condominium lessors do not wish to purchase the fee simple title). In such a situation, the original land owner will share the fee simple title to the land with each condominium purchaser as a cotenant.

Ordinance § 4.4 (setting forth seven requirements that lessee must meet before a sale takes place), might not file an application with the Department. The Department might conclude in any given case that exercising its power of eminent domain would not further the public purpose of the Ordinance. In any event, the required preliminary negotiations could result in an agreement as to the appropriate compensation. Because any one of these contingent events might not occur, we conclude that the landowners' claim under the Just Compensation clause is not ripe for federal adjudication.

The Supreme Court's clear guidance regarding application of the ripeness doctrine to takings claims reinforces our conclusion that the landowners' claim is not ripe. The Court has "placed two hurdles in the way of a takings claim brought in federal court against states and their political subdivisions." *Levald, Inc., v. City of Palm Desert,* 998 F.2d 680, 686 (9th Cir.1993) (internal quotation omitted). It is the second of these two hurdles, which requires that plaintiffs "seek compensation through the procedures the State has provided for doing so before turning to the federal courts," *id.* (internal quotation omitted), that has not been met here. Because no property has been targeted for taking, the landowners have not sought and been denied condemnation by the Department. Moreover, the landowners have not invoked the processes provided by Hawaii's courts for obtaining just compensation.

The landowners argue and the dissent concludes, however, that their claims are ripe because the Ordinance's plain language fails to provide for full compensation. Requiring the landowners to seek compensation through Hawaii's procedures, they argue, would be futile under existing state law. *See id.* at 686. The landowners burden of showing that complying with the state's procedures would be futile is a heavy one. *American Savings & Loan Ass'n v. County of Marin,* 653 F.2d 364, 371 (9th Cir.1981). We conclude that the landowners have not carried their burden.

The Ordinance provides that "[t]he compensation to be paid ... shall be the current fair market value of the leased fee interest." Honolulu City & County, Haw. Ordinance § 1.2. It defines "leased fee interest" as the "reversionary interests of the fee owner ... other than the lessee's or sublessee's interest." *Id.* The dissent argues that the plain meaning of the Ordinance deprives the landowners of compensation for the lost stream of rental payments and, therefore, "unless the Ordinance means something other than what it very clearly says, it does not authorize the Department to give landowners just compensation." *Dissenting Opinion* at 1170. We disagree.

The Ordinance speaks of "reversionary interests" as being in the plural. This points to a recognition of multiple factors to be included in the valuation. The Fifth Circuit has stated that a "reversionary interest is *any* future interest left in a transferor or his successor in interest." *United States v. 50.822 Acres of Land, More or Less,* 950 F.2d 1165, 1169 n. 4 (5th Cir.1992) (internal quotation omitted) (emphasis added). The Department could well interpret the "reversionary interests" of the fee owner as his entire interest in the land under the condominiums as of the date the eminent domain action is commenced.

Basic principles of property law, in fact, practically compel that interpretation. The reversionary interest of a lessor, as the dissent notes, is "[t]he property that reverts to the grantor after the expiration of an intervening income interest." *Blacks Law Dictionary* 1186 (5th ed. 1979). In other words, a reversionary interest is "[a] right to the future enjoyment of property, at present in possession or occupation of another." *Id.* The Ordinance thus directs the Department to pay the fair market value of the property which reverts to the lessor at the expiration of the lease. What reverts to the lessor is a fee interest in the ground underneath the condominium. The projected earning of that property would be a normal factor in determining the value of the property that reverts to the lessor. *See* Ordinance 91–95 at § 1.2 (defining fair market value as the price to which a willing buyer and seller taking into consideration "all uses to which the land is adapted or might in reason be applied").

We hold that the landowners' challenge is not ripe. There are obviously many different ways the Department could approach the valuation of the lessors' reversionary interest. The Department has not issued regulations regarding the compensation of the landowners and there is no basis for determining that the landowners will not be fully compensated for their interests. It is apparent that the "plain meaning" of the Ordinance does not foreclose the payment of constitutionally adequate compensation for the landowners' "reversionary interests." Moreover, the City's intent to pay the current fair market value of the leased fee interest is clear. The Ordinance anticipates a complete valuation of the lessors' property interests. It is only if the definition of "leased fee interest" is given a restricted meaning that the landowners would not receive constitutionally adequate compensation. Until that happens, federal adjudication of the landowners' just compensation claim is premature.

### D. The Due Process Clause

■■■ The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV; *accord* Haw. Const. art I, § 5. The Due Process clause confers both procedural and substantive rights. *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987); *Armendariz v. Penman*, 75 F.3d 1311, 1318 (9th Cir.1996) (en banc). A municipal act that neither utilizes a suspect classification nor draws distinctions among individuals that implicate fundamental rights will violate substantive due process rights when it is shown that the action is not "rationally related to a legitimate governmental purpose." *Munoz v. Sullivan*, 930 F.2d 1400, 1404 (9th Cir. 1991). We will strike down a statute on substantive due process grounds if it is arbitrary and irrational. *Del Monte Dunes v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir.1990).

The landowners again argue that the Ordinance is arbitrary and irrational because it has no legitimate public purpose, because lease-to-fee statutes have been proved not to work, and because the Ordinance is not rationally related to achieving a valid objective.

■■■ The challengers' burden to show that a statute is arbitrary and irrational is extremely high. *See Del Monte Dunes*, 920 F.2d at 1508. "In a substantive due process challenge, we do not require that the City's legislative acts actually advance its stated purposes, but instead look to whether 'the governmental body *could* have had no legitimate reason for its decision.'" *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234 (9th Cir.1994) (quoting *Levald, Inc.*, 998 F.2d at 690). As explained above, *see supra* section II(B)(2), the City has expressed a valid public purpose in attempting to control condominium price inflation. Furthermore, the City's decision to utilize a lease-to-fee ordinance to effectuate this purpose is not irrational. *See supra* section II(B)(3). Accordingly, we hold that the landowners cannot meet the burden of showing irrationality.

### E. The Equal Protection Clause

The United States Constitution guarantees that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. const. amend XIV; *accord* Haw. Const. art. I, § 5. The Bishop Estate and the Small Landowners assert that Ordinance 91–95 violates the Equal Protection Clause in two ways. First, the Bishop Estate alleges that ordinance 91–95 was enacted to favor non-Hawaiian lessees over Native Hawaiians and Native Hawaiian Trusts in violation of their equal protection rights. The Small Landowners additionally allege that the Ordinance violates their equal protection rights by "irrationally grouping together all condominium landowners without any factual or legal basis for inclusion of small landowners."

#### 1. Native Hawaiians' equal protection claims

■■■ The Ordinance applies to condominiums regardless of whether the owner is Native Hawaiian or non-Hawaiian. It thus does not on its face draw a distinction on the basis of a suspect classification. Nonetheless, the landowners assert that the Ordinance is unconstitutional due to its discriminatory ef-

fects. To prevail, however, the Bishop Estate must show not only a discriminatory effect, but also discriminatory intent. *Village of Arlington Heights v. Metropolitan Housing Dev. Co.,* 429 U.S. 252 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450, (1977).

The Bishop Estate introduced no evidence of discriminatory intent on the part of the City. Instead, the Estate alleged that the City must have known that it and other Native Hawaiians owned numerous interests in leased condominiums and therefore that the City was aware the Ordinance would severely affect the Bishop Estate Trust and would harm the interests of Native Hawaiians. We agree with Judge Ezra that these allegations, even if true, do not present a prima facie case of discrimination. It is not enough to show that the City knew the law would affect Native Hawaiians. "Discriminatory purpose ... implies more than an awareness of consequences." *Personnel Adm'r v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). Because the landowners offered no other evidence of discriminatory intent, summary judgment on their equal protection claim was appropriate.

### 2. *Small Landowners' equal protection claim*

■ The Small Landowners contend that the Ordinance violates their equal protection rights by grouping small landowners with owners such as the Bishop Estate, which owns many condominium projects. We disagree.

The Small Landowners do not contend they constitute a suspect class; hence, we will uphold the Ordinance if it is rationally related to a legitimate state interest. *See Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). As explained above, the Ordinance furthers a legitimate state interest. *See supra* section II(B)(2). The Ordinance is rationally related to that interest. *See supra* section II(B)(3). Thus we hold Ordinance 91–95 does not violate the Small Landowners' equal protection rights.

### III. ORDINANCE 91–96

#### A. *The Ordinance*

As noted above, the land underneath condominiums on Oahu ordinarily is owned by someone other than the owner of the condominium. The condominium owner leases the ground under the condominium, ordinarily for very long terms. In the typical lease, the rent initially is fixed for a term of years, after which the rent is subject to renegotiation. The renegotiated rent is normally a percentage of the fair market value of the land appurtenant to the unit exclusive of improvements, as of the date of renegotiation. The rapid rise in Hawaiian land prices often results in renegotiated rent several hundred times greater than the initial fixed rent.

Ordinance 91–96 was enacted at the same time as Ordinance 91–95 and essentially is a rent control ordinance. The Ordinance accomplishes its goal in two ways. First, the Ordinance, which applies to all leases that contain provisions for renegotiation of lease rents for owner-occupied condominiums, limits the number and regulates the timing of renegotiations. Section 1.4 of the Ordinance provides that the first renegotiation shall not occur within fifteen years of the initial date of the lease, while subsequent renegotiations shall occur no sooner than every ten years.

Second, the Ordinance caps rents by linking the maximum renegotiated rent to the consumer price index. Section 1.5(b) of the Ordinance limits the renegotiated rent to the initial rent multiplied by a rent factor. The initial rent is the greater of the rent specified by the lease and the reasonable rental value on the effective date of the lease. Honolulu City and County, Haw. Ordinance 91–96 § 1.1. The rent factor is the average consumer price index for the six-month period in which the rent renegotiation occurs, divided by the average consumer price index on the date of the initial lease. *Id.* § 1.5(b)(1)–(2).

The Ordinance also contemplates the conveyance of condominiums subject to renegotiated leases on the underlying land. Section 1.10 of the Ordinance facilitates the conveyance or transfer of these renegotiated leases. That section provides that, if an owner-occu-

pant of a condominium conveys or transfers the leasehold interest in the underlying land during a renegotiated rent period to a person who intends to occupy the condominium apartment, the renegotiated land rent shall apply to the transferee tenant. *Id.* § 1.10. In other words, the owner-occupant of a condominium is free to convey his or her leasehold interest in the underlying land to a person intending to occupy the condominium and the transferee will receive the benefit of the renegotiated land lease. However, if the condominium is conveyed to someone who is not an owner-occupant, the lessor of the underlying land may reopen the negotiation. *Id.* § 1.13.

The Bishop Estate moved for summary judgment, contending that Ordinance 91–96 violates the Takings, Contract and Due Process Clauses. The district court ruled, at summary judgment, that the Ordinance violates the Takings Clause. The district court did not reach the Bishop Estate's Contract and Due Process Clause arguments.

The City and the HALE coalition each filed a timely notice of appeal.

### B.  *The Takings Clause*

The Bishop Estate argues that Ordinance 91–96 violates the Takings Clause in two ways. First, the Estate contends that Ordinance 91–96 fails to substantially further its stated public purposes and, therefore, constitutes a regulatory taking because the Ordinance allows a lessee to monetize a below-market renegotiated rent at the expense of the lessor. Second, the Bishop Estate asserts that the Ordinance violates the Fifth Amendment because it fails to provide for consideration of individualized factors that might affect the value of the lease at the time of renegotiation. The City and HALE coalition argue that individualized consideration is not necessary and the alleged ground lease premium does not render the Ordinance unconstitutional. We turn to the Bishop Estate's argument that the Ordinance fails to substantially further a legitimate state interest.

A land use regulation, as noted above, does not effect a taking if it substantially furthers a legitimate state interest and does not deny

the landowner economically viable use of his land. *Dolan,* 512 U.S. at 385, 114 S.Ct. at 2316–17. Ordinance 91–96 is designed to further the City's interest in maintaining affordable owner-occupied residential housing. Honolulu City & County, Haw. Ordinance 91–96, § 1. The Bishop Estate does not maintain that this is not a legitimate state interest, but rather asserts that the Ordinance fails to substantially further that interest. The Bishop Estate cites *Yee v. City of Escondido,* 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) in support of its argument.

*Yee* involved a rent control ordinance enacted by the City of Escondido that capped the rent a mobile home park owner could charge his lessees. *Yee,* 503 U.S. at 524, 112 S.Ct. at 1526–27. The Yees, owners of two mobile home parks, brought suit alleging that the rent control ordinance violated the Takings Clause. *Id.* at 525, 112 S.Ct. at 1527. They offered two arguments in support of their contention: (1) the rent control ordinance effected a physical taking of their property; and (2) the ordinance effected a regulatory taking of their property.

The Court did not reach the regulatory taking issue because that question was "not fairly included in the question on which we granted certiorari." *Id.* at 533, 112 S.Ct. at 1531. With respect to their physical taking argument, the Yees relied "heavily on their allegation that the ordinance benefits incumbent mobile home owners without benefiting future mobile home owners, who will be forced to purchase mobile homes at premiums." *Id.* at 530, 112 S.Ct. at 1529. The Court pointed out that this premium effect distinguished the Escondido ordinance from ordinary rent control statutes. Apartment tenants do not sell anything to their successors and, quite often, are statutorily precluded from charging "key money." *Id.* The ordinary rent control ordinance does not allow the lessee to monetize the present value of the reduced rent by conveying an apartment subject to a lease with a below market rent. Although the Court ultimately rejected the Yees' argument because "it has nothing to do with whether the ordinance causes a *physical* taking," *id.,* it noted that "[t]his

effect might have some bearing on whether the ordinance causes a *regulatory* taking, as it may shed some light on whether there is a sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance." *Id.* (citing *Nollan*, 483 U.S. at 834–35, 107 S.Ct. at 3147–48).

The Bishop Estate makes a similar challenge to Ordinance 91–96. It contends that the Ordinance's conveyance provisions create a premium, which an owner-occupant can capture when she sells a condominium subject to a renegotiated land rent. If the transferee intends to occupy the condominium, she receives the benefit of the renegotiated rent. Hence, the transferor will charge a premium reflecting the net present value of the difference between the renegotiated land rent and the free market land rent.

The district court found that the Ordinance allowed a lessee to capture the present value of the below market land rent. *Richardson II*, 802 F.Supp. at 338. The Ordinance's failure to regulate resales, according to the district court, effected a transfer of wealth from lessors to lessees. *Id.* Because of this transfer of wealth, which generally does not occur in the ordinary rent control ordinance, the court held that the Ordinance is unconstitutional. While we agree that the Ordinance effects a regulatory taking and, therefore is unconstitutional, we do so for somewhat different reasons than the district court.

The City enacted the Ordinance to provide renegotiated land lease rents "which are affordable to condominium apartment owner-occupants and fair to lessors" and to "maintain [affordable housing] for owner-occupants." The conveyance provision, as explained above, vitiates the cause-and-effect relationship between the property use restricted (rent rates) and the social evil the Ordinance seeks to remedy (lack of affordable housing). Despite this, the City and the Hale Coalition assert that it does not effect an unconstitutional regulatory taking. They assert that all land use regulations increase the value of some property while decreasing the value of other property.

■ Initially, we must determine whether the Bishop Estate's takings claim is ripe. "There are two independent prudential hurdles to a regulatory taking claim brought ... in federal court." *Suitum v. Tahoe Regional Planning Agency*, —— U.S. ——, ——, 117 S.Ct. 1659, 1664, 137 L.Ed.2d 980 (1997). The first hurdle, that the plaintiff obtain a final decision regarding the application of the regulation to the property at issue from the entity charged with implementing the regulation, *id.* at ——, 117 S.Ct. at 1665, does not apply to facial regulatory takings claims. *Levald*, 998 F.2d at 686. Twice before we have characterized premium based challenges to a rent control statute as facial challenges. *See Carson Harbor*, 37 F.3d at 474 n. 5 ("In *Levald*, which involved similar facts, we noted that the premium is 'relevant only to a facial, not an as-applied, regulatory challenge.'"). The first hurdle thus does not apply to the Bishop Estate's argument.

"The second hurdle stems from the Fifth Amendment's proviso that only takings without 'just compensation' infringe that Amendment; 'if a State provides adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation clause until it has used the procedure and been denied just compensation.'" *Suitum*, —— U.S. at ——, 117 S.Ct. at 1665 (quoting *Williamson County*, 473 U.S. at 195, 105 S.Ct. at 3121 (1985)). Because the Bishop Estate's argument that the Ordinance does not substantially further a legitimate state interest does not depend upon the extent to which the Estate is compensated, its facial regulatory taking claim is ripe. *See Yee*, 503 U.S. at 534, 112 S.Ct. at 1532 ("As this [premium argument] does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or the extent to which these particular petitioners are compensated, petitioners' facial challenge is ripe."). We therefore turn to the merits of the Bishop Estate's argument.

■ Land use regulations do influence the value of property, but to be constitutional, they must do so in a manner that substantially furthers a legitimate government interest. *Nollan*, 483 U.S. at 834, 107 S.Ct. at 3147. Ordinance 91–96 does not do this. It regulates the use of the lessors' property

interests in a manner that does not substantially further the goal of creating affordable housing. The absence of a mechanism that prevents lessees from capturing the net present value of the reduced land rent in the form of a premium, means that the Ordinance will not substantially further its goal of creating affordable owner-occupied housing in Honolulu. Incumbent owner occupants who sell to those who intend to occupy the apartment will charge a premium for the benefit of living in a rent controlled condominium. The price of housing ultimately will remain the same. The Ordinance thus effects a regulatory taking. *See id.* (regulation must substantially advance a legitimate state interest); *see also, Pennell v. San Jose,* 485 U.S. 1, 20, 108 S.Ct. 849, 862, 99 L.Ed.2d 1 (1988) ("Traditional land-use regulation (short of that which totally destroys the economic value of property) does not violate [the principle that one should not be forced to bear a burden which belongs to the public as a whole] because there is a cause-and-effect relationship between the property use restricted by the regulation and the social evil that the regulation seeks to remedy.") (Scalia, J., concurring). We accordingly hold that Ordinance 91–96 violates the Fifth Amendment to the Constitution of the United States.[7]

### IV. CONCLUSION

In summary, we hold that Ordinance 91–95 (the lease to fee ordinance) is constitutional. The Ordinance admittedly takes private property, but it does so for a sufficiently public purpose and no constitutional deprivation has as yet been established. Ordinance 91–96 (the rent control ordinance), on the other hand, is unconstitutional because it to substantially further a legitimate governmental interest. The respective judgments of the district courts are therefore

AFFIRMED.

O'SCANNLAIN, Circuit Judge,
concurring in part and dissenting in part.

I join the court's opinion regarding the constitutionality of Ordinance 91–96. With respect to Ordinance 91–95, I concur in the court's conclusion in Part II–B that there is no violation of the Public Use Clause, but write separately to express concern about *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). I respectfully dissent from Part II–C, however, because I believe that the challenge to Ordinance 91–95's compensation provision is ripe, and that the provision does not provide just compensation.

### I

In Part II–B the court concludes that Ordinance 91–95 does not violate the Public Use Clause and relies heavily on *Hawaii Housing Authority v. Midkiff.*

### A

The Fifth Amendment to the Constitution states: "... nor shall private property be taken for public use without just compensation." U.S. Const., amend V. The Public Use Clause is an explicit limit on the power of the government to take private property for, as the Supreme Court has long recognized, a taking must be for public use; a taking for a purely private use is unconstitutional. *See Thompson v. Consolidated Gas Corp.,* 300 U.S. 55, 80, 57 S.Ct. 364, 376, 81 L.Ed. 510 (1937).

Notwithstanding this principle, however, the Supreme Court in *Midkiff* gave the Public Use Clause an exceedingly broad reading: to satisfy the Clause, a taking need only be "rationally related to a conceivable public purpose." *Midkiff,* 467 U.S. at 241, 104 S.Ct. at 2329. "The 'public use' requirement is thus coterminous with the scope of a sovereign's police powers." *Id.* at 240, 104 S.Ct. at 2329; *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.,* 503 U.S. 407, 422–24, 112 S.Ct. 1394, 1404–05, 118 L.Ed.2d 52 (1992).

Since *Midkiff* was decided, however, the Supreme Court's regulatory takings jurisprudence has undergone considerable change.

---

7. In light of our conclusion that Ordinance 91–96 fails to substantially further a legitimate state interest, we need not reach either the Bishop Estates argument that it fails to provide for consideration of the characteristics of individual lessors or its other arguments.

*See Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). *Nollan, Lucas,* and *Dolan,* of course, dealt with a different area of takings jurisprudence, subject to a different set of rules than the one before us: here we have a challenge under the Public Use Clause whereas that trio dealt with regulatory takings.

Notwithstanding that the *Nollan–Lucas–Dolan* trio dealt with a different part of the Takings Clause, the landowners argue that these cases have modified *Midkiff*'s deferential review of a legislature's public use determination. The court rejects this argument, and I agree: the *Nollan–Lucas–Dolan* trio does not expressly modify or overrule *Midkiff,* and therefore we must apply *Midkiff* in this case. Indeed, recent Ninth Circuit authority confirms that *Midkiff* is still viable. *See Bay View, Inc. v. AHTNA, Inc.,* 105 F.3d 1281, 1286 (9th Cir.1997) ("After [*Midkiff*], a legislative determination of what constitutes 'public use' is subject to 'an extremely narrow' review, and will be upheld so long as it's rational."). *Midkiff*'s deferential standard compels me to conclude that Ordinance 91–95's taking serves a "conceivable public purpose."

### B

Although *Midkiff* has not been overruled, and although *Nollan, Lucas,* and *Dolan* deal with a different part of the Takings Clause, I nevertheless believe that there is tension between these two lines of authority. The underlying thrust of the *Nollan–Lucas–Dolan* decisions—increasing the scrutiny of regulations to determine if they go "too far" (enough to require compensation)—is inconsistent with *Midkiff*'s sweeping deference. It may be time for the Supreme Court to reconsider *Midkiff.*

To provide the context for this observation, I must take a brief detour. It seems to me that, speaking in broad terms, there are three ways the government can exercise control over property, especially real property.

First, it can regulate pursuant to its broad police powers. Second, it can use its power of eminent domain to take the property without the consent of the owner as long as it pays just compensation. Third, it can buy land from a voluntary seller after negotiating a price—that is, it can use its revenues to behave like any other arm's length purchaser of private property. *See* Thomas W. Merrill, *The Economics of Public Use,* 72 Cornell L.Rev. 61, 72 (1986).

*Nollan, Lucas,* and *Dolan* dealt with the relationship between the first two categories. *Lucas* established when a government regulation goes too far. *See Lucas,* , 505 U.S. at 1030, 112 S.Ct. at 2901 ("When … a regulation that declares "off-limits" all economically productive or beneficial uses of land goes beyond what the relevant background principles would dictate, compensation must be paid to sustain it."). *Nollan* and *Dolan* tightened the required fit between the legitimate purpose sought to be accomplished by a government regulation and the means chosen—thereby identifying some exercises of the police power as takings. A police power regulation will be treated as a taking—an exercise of eminent domain—requiring compensation unless it adequately fits its purposes; that is, unless there is an "essential nexus" between a legitimate state interest and the regulation. *See Dolan,* 512 U.S. at 385–87, 114 S.Ct. at 2317; *Nollan,* 483 U.S. at 837, 107 S.Ct. at 3148–49.

The *Nollan–Lucas–Dolan* trio therefore established that the Takings Clause is a limitation upon the state's police powers; if a regulation goes too far, or does not have the right fit, then it must be treated as an exercise of eminent domain—a taking—which requires compensation. The Public Use Clause appears to serve the same sort of function, but with respect to the second and third categories—it limits the state's power of eminent domain. If an exercise of eminent domain goes too far—if it is for a private purpose, not a public one—then it cannot stand. If the state wants to acquire property in such circumstances (and has the statutory authority to do so), it may negotiate with the landowner to purchase the property at an

agreed price, but it may not use its condemnation power.[1]

Because the *Nollan–Lucas–Dolan* trio increased the level of scrutiny given to police power regulations, identifying some of them as takings, it stands to reason that the same increased scrutiny should be given to outright condemnation. If a taking does not have the required fit—perhaps something like *Nollan*'s "essential nexus"—between its proclaimed public use and its actual effect, then it should be invalid under the Public Use Clause.

The court's opinion seeks to distinguish these cases, but I am unpersuaded. To the majority, the distinction is the provision of compensation: "[W]e see nothing inconsistent in applying heightened scrutiny when the taking is uncompensated, and a more deferential standard when the taking is fully compensated." Whereas the majority is correct that there is less reason to be suspicious of a fully compensated taking than an uncompensated one, more deference does not imply absolute deference. We ought not vitiate the public use requirement because, even if a landlord does receive the "fair market value" of the property, the landlord loses his right to exclude. Whether because of a sentimental attachment to his property or a conviction that the property is actually worth more than what the market will currently bear, a landlord might choose not to sell, even at the "fair market value." The landlord who refuses to sell is asserting his right to exclude. As the *Dolan* Court recognized, "th[e] right to exclude others is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Dolan*, 512 U.S. at 393, 114 S.Ct. at 2320 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979)). The public use requirement protects this right by limiting government encroachment on private property—by forcing the government to prove that it is upholding the public welfare and not merely transferring wealth to a class of persons with a stronger political voice.

Therein lies the mischief of *Midkiff*. Hopefully the Supreme Court will have the opportunity to extend its emerging takings jurisprudence to protect the right to exclude and to add vitality to the public use requirement. If the Clause is to have any effect at all, it must mean that a court will not feign blindness when it sees through a patently transparent legislative recital that a taking is for a public use. When the government uses eminent domain to take real property from A and give it to B, with no meaningful impact on anyone else or on the community at large, the taking is purely private and should violate the Public Use Clause.

In my view, Ordinance 91–95, unlike the statute in *Midkiff*, is a purely private taking. In *Midkiff*, the legislature was attempting to break up an oligopoly in land ownership—a remnant of Hawaii's feudal past—to allow single family home ownership. Breaking apart large blocks of land held by a small group of landowners—blocks which encompassed almost half the entire State of Hawaii—could be reasonably expected to spark more land transactions and lead to a more fluid real estate market. *See Midkiff*, 467 U.S. at 232–33, 104 S.Ct. at 2324–25. That some economists might disagree with the legislature's remedy does not mean that the statute would be invalid—it retained an "essential nexus" to its purpose and would be constitutional.

In this case, however, the Honolulu City Council found no land oligopoly, but a mere concentration of land ownership in the hands of landowners (a tautology), many of whom refused to sell their land to their leasehold tenants (typically groups of highrise condominium owners), which in turn led to increased real property prices. As a remedy, when properly triggered, Ordinance 91–95 would condemn the property of the landowners and transfer it in pro rata shares to the condominium owners. It seems to me that the ordinance is nothing more than a naked transfer from one property owner to anoth-

---

1. This is not to say that the Public Use Clause prohibits the government from possessing property for a non-public use; if the government with the statutory power to do so purchases the prop- erty from a voluntary seller, there is no taking at all because there is no use of eminent domain. The government becomes the owner with the consent of the seller.

er—from landlords to tenants. To be sure, because tenants will be able to own land that they could not purchase in the open market, the ordinance might well make today's tenants better off, and will certainly eliminate their need to pay rent altogether. But transferring title to the tenants will not change the value of the property—which will still equal the combined value of the leasehold interest and the reversionary interest—and hence should not lower the price a seller will demand. If the landlords constituted an oligopoly, then the division of the ownership of the land could have the effect of lowering land prices from an oligopolistic level to something approaching the free-market level. In the absence of a showing of an oligopoly, however, Ordinance 91–95 has nothing to do with changing the structure of Hawaii's real estate market.

Nevertheless, *Midkiff*'s language limits the public use inquiry to whether there is a conceivable public purpose behind the law. Applying that deferential standard, I conclude that Ordinance 91–95 barely passes muster, and therefore I reluctantly concur in the court's conclusion that it does not violate the Public Use Clause.

## II

In Part II–C of its opinion, the court concludes that the landowners' compensation claims are not ripe. It does so while theoretically recognizing the well-established rule that a party need not seek compensation when doing so would be futile under existing state law. *See Levald, Inc. v. City of Palm Desert,* 998 F.2d 680, 686 (9th Cir.1993); *see also Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 196–97, 105 S.Ct. 3108, 3121–22, 87 L.Ed.2d 126 (1985).

Ordinance 91–95 sets the compensation for the taking as "the current fair market value of the leased fee interest." Ordinance 91–95, § 5.3. It defines the "leased fee interest" as the "reversionary interests of the fee owner." *Id.* at § 1.2.

By its plain meaning, the ordinance pays only the current fair market value of the landowner's reversionary interest. In other words, the landowner gets paid only for his interest in the property which excludes the leasehold. Conspicuously absent from this formula is any payment for the current stream of rental payments from the tenants to the landlord. Undoubtedly, the landlord has a protected property interest in the rental payments—a lessor's interest distinct from the reversionary interest in the land. Currently, the tenants pay rent to the landlord for the lease term. Under the ordinance, the tenants stop paying rent immediately upon condemnation. The landlord loses the stream of payments for the leasehold period but is not compensated for the loss.

In the court's view, Honolulu's Department of Housing and Community Development could interpret the compensation provision broadly and include the lost rental payments in the compensation formula. I do not think a fair (or even generous) reading of the ordinance will sustain that conclusion. The ordinance is clear: the landowners will get paid only for their "reversionary interests," which, as a matter of basic property law, do not include the current income from the property. *See Black's Law Dictionary* 1186 (5th ed. 1979) (defining "reversionary interest" as "[t]he property that reverts to the grantor after the expiration of an intervening income interest"). The Supreme Court has recognized that merely compensating a lessor for the reversionary interest is insufficient:

> "[W]hen a lease of trust land is made, ... upon a subsequent condemnation by the United States, the trust must receive the then full value of the reversionary interest that is subject to the outstanding lease, *plus, of course, the value of the rental rights under the lease.*"

*Alamo Land & Cattle Co., Inc. v. Arizona,* 424 U.S. 295, 303, 96 S.Ct. 910, 916, 47 L.Ed.2d 1 (1976) (emphasis added). The landlord must receive the value of the leased payments because that is the difference between what is taken by the government (a present fee simple) and the fair market of the "reversionary interests."

The court reaches the incorrect result because its analysis is incomplete. After noting that what reverts back to the landlord is a fee interest, the court states that "[t]he projected earning of that property would be a

normal factor in determining the value of the property that reverts to the lessor." The court is correct in that what reverts back is a fee interest, and that the value of a fee interest takes into account all projected earnings. The court does not recognize, however, that a reversionary interest in fee simple is a lesser estate than a present fee simple, and that the difference is the interim lease payments. One can view the value of property as the sum of the discounted *future* cash flows. A reversionary interest is less valuable than a present fee simple because the value of a reversionary interest does not include the rent payments made prior to reversion, as those would be *past* cash flows.

Thus, to provide just compensation, Hawaii must pay the landlords the value of the reversionary interest plus the present value of the lease payments. There is no need to wait and see how the Department administers Ordinance 91–95, for unless the ordinance means something other than what it very clearly says, it does not authorize the Department to give landowners just compensation. In light of the plain meaning of the ordinance, any compensation paid by Honolulu to the landowners would be constitutionally inadequate. The formality of pursuing such compensation would therefore be futile. For that reason, I would conclude that the landowners' compensation claims are ripe for review, and that the district court's order should be reversed to that extent.